## STATE *vs.* WILLIAM RANDALL.

The offences of counterfeiting bills of the Bank of the United States, of passing, and of knowingly having in possession such counterfeits, with intent to pass them, are cognizable by the courts of this state, under the statute of this state, against counterfeiting, notwithstanding the congress of the United States, in virtue of the *eighth* section of the *first* article of the constitution, have legislated on the subject, and given to the courts of the United States jurisdiction of the same offences.

The jurisdiction of the United States' courts under the acts of Congress, and of the courts of this state, under the statute of Vermont, over those offences, are concurrent within this state.

The existence of the Bank of the United States, and of its branches, and that they have been in operation, are matters of general knowledge and notoriety, not requiring the formality of proof, on a trial for counterfeiting the bills of said bank.

The act of this state against counterfeiting bank notes, (*stat.* p. 261, ch. 31, § 34,) is not void for repugnancy. The word *counterfeited,* where it occurs in the second clause of the section, is to be understood in the sense of the word *counterfeit.*

Form of a valid indictment, upon said act, for the crime of knowingly having in possession a counterfeit bill, with intent to pass the same.

WILLIAM RANDALL was indicted by the grand jury within and for the county of Franklin, at the special term of the county court for said county, begun and holden on the 14th day of November, 1826, for *counterfeiting* bank bills *of the Bank of the United States,* and also for *having in his possession the same counterfeit bills, with an intention to utter, pass and give them in payment, knowing them to be counterfeit.*

The indictment contained *four* counts.

The first and third were for counterfeiting.—The *second* was for *having in possession,* &c. and was as follows :—

And the grand jurors aforesaid, upon their oath aforesaid, do further present, that *William Randall,* late of Franklin, in the county of Franklin aforesaid, heretofore, that is to say, on the twenty-third day of September, in the year of our Lord one thousand eight hundred and twenty-six, with force and arms, at Franklin aforesaid, in the county of Franklin aforesaid, feloniously and unlawfully did have in his possession, with an intention to utter, pass and give in payment, one certain false, forged and counterfeit bank note, which said note was made in imitation of, and did then and there purport to be, a bank note for the sum of ten dollars, issued by the president, directors and company of the bank of the United States, made pay-

*Franklin,*
January,
1827.

State
*vs.*
Randall.

able at their office of discount and deposit in *Charleston,* to *James Johnson,* president thereof, or to the bearer, on demand, numbered three thousand and fourteen, and dated at *Philadelphia,* the twentieth day of January, in the year of our Lord one thousand eight hundred twenty-three, with the name of *L. Chevis* thereto subscribed as president of said bank, and the name of *Thomas Wilson,* countersigned thereon as cashier of said bank, and was in the words and figures following, that is to say,— [here the bill was set forth *verbatim.*] He the said *William Randall* then and there, well knowing the said note to be false, forged and counterfeited as aforesaid, contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the state.

The *fourth* count was in all respects like the second, except in the description of the bill.

The defendant pleaded *Not Guilty.*

On trial, the prosecutor introduced a witness, who testified, that on the day mentioned in the indictment, he was sent with a warrant to apprehend and search the respondent, for counterfeit money. That the respondent had just started on a journey with the family and effects of his brother, *Michael Randall,* and to carry the same to *Michael Randall,* then in Troy, New-York ;----that the witness overtook the respondent, in *Franklin,* informed him of his business, and demanded of him his counterfeit money ;----that the respondent, in some apparent agitation, replied, that he was carrying his money, (or *the* money) to another man, at the same time handing his pocket-book to the witness ;----that the pocket-book contained some good money, in which was one ten dollar bill of the description of these counterfeited bills ;----that the respondent, on being asked if he had other money with him, declared he had not ; but the witness proceeded to search his person, and in his pantaloons' pocket, found the bills in question, with others of like description, to the amount of about one hundred dollars, wrapped in brown paper. That the respondent, soon after this, at his examination before the magistrate, said he took the bills from a chest of his brother *Michael,* which was part of the furniture he was then conveying.

The respondent called no witnesses, but several witnesses for the state, on cross examination, gave him a good character, previous to this transaction.

The prosecutor having proved the bills in question, and those found with them, to be counterfeit, rested his case, and claimed conviction.

The respondent's counsel insisted, and requested the Court to charge the jury, that the respondent could not be prosecuted upon this indictment for the offence charged, because, if any offence was committed, it was against the laws of the *United States* :----that it was incumbent on the prosecutor to prove the existence of the United State's Bank, and that the same,

Franklin,
January,
1827.

State
vs.
Randall.

and the branch thereof, said to be established at *Charleston*, were, or had been in operation.

The court, after instructing the jury that upon the evidence aforesaid, the respondent was entitled to a verdict of acquittal on the *first* and *third* counts of the indictment, charged them, in reference to the *several* points aforesaid, as applicable to the *second* and *fourth* counts in the indictment, to the following effect :—That the offence charged in said last mentioned counts is punishable by the laws of this state, and before this court ; and that the existence of the Bank of the United States, and the fact that the bank and the branch aforesaid have been in operation, are matters of general knowledge and notoriety, not requiring the formality of proof on this trial. The other parts of the charge, not being excepted to, are not material to be repeated.

Whereupon the jury returned their verdict in favour of the respondent, on the first and third counts, and against him on the *second* and *fourth* counts of the indictment. To which several parts of the charge, the respondent excepted.

The respondent thereupon moved the court for a *new trial*, for the matters excepted to as aforesaid ; and also filed the following motion in arrest of judgment.

And now the said *William Randall*, in court here, after verdict against him, and before judgment, prays the Hon. Court, that the judgment upon said verdict may be arrested, and no further proceedings had thereon, and that he may be discharged from this indictment, for the following causes, *to wit :—*

1. That the crime of counterfeiting, or having in possession, with intent to put in circulation, a bill or note purporting to have been issued by the president, directors and company of the bank of the United States, but which is alleged to be counterfeit, and that known to the respondent, is a crime against a law of the United States, of which the *circuit court* of the United States only, has cognizance and jurisdiction.

2. That this Court has no jurisdiction to hear, try and determine, or to take any cognizance of the crime alleged against the respondent in this indictment.

3. That the said indictment, and the pretended act of the legislature of the state of Vermont, on which the same is founded, are so repugnant, inconsistent and nonsensical, that the same are wholly insufficient in law, for any judgment to be rendered thereon.

4. That the statute of this state, on which this indictment is framed, is wholly null and void, having been passed to punish a crime against the *United States*; jurisdiction over which belongs, wholly, to the legislature of the United States, and must be given by congress to the courts of the United States, and cannot be assumed by this state, or transferred by congress to this state, or its courts.

5. That the indictment, in this case, is not according to the statute.

State
vs.
Randall.

The record having been duly certified up to this Court, the cause was fully argued, at this term, on both motions.

*Van Ness,* for the respondent. In support of the motion for a new trial, he insisted, that the fact of the existence of the Bank of the United States, and of its having issued bills, ought to have been proved, at least *prima facie.*

In support of the motion in arrest, he contended, that the offence charged in the indictment is within the exclusive jurisdiction of the courts of the United States. The eighth section of the first article of the constitution of the United States gives to congress the power to provide for the punishment of counterfeiting the securities and current coin of the United States.

The bank, he said, is a publick and legitimate means of carrying into effect the powers of congress touching their monied concerns; and the bills thereof are publick securities of the United States. It is only on this ground that the act establishing the Bank of the United States has been decided to be constitutional. (*M'Culloch* vs. *State of Maryland,* 4 *Wheat.* 316.) The case, therefore, is within the spirit of this clause of the constitution.

The power here granted must be exclusive. Punishment, from its very nature, is not divisible. But if the state ever had this power, it ceased, on congress acting and exercising *their* power by legislating on the subject. It has been decided in Virginia and New-York, that the state courts have not jurisdiction of offences, under the acts of the United States.----*U. States* vs. *Lathrop,* 17 *Johns. Rep.* 4.

It is not the existence of the powers of congress, but their *exercise,* which is inconsistent with the powers of the states.

He was well aware, he said, of the *proviso* in the act of congress establishing the bank. But this proviso is a nullity. Congress, by legislating on the subject, having, on constitutional principles, taken the jurisdiction away from the state courts, the proviso is useless and void. It can give no jurisdiction which the constitution has taken away.

The act constituting the offence is one and indivisible: yet, by the laws of Vermont, it is made a crime against *this state,* and by the act of congress, it is made a crime against the United States. These are independent sovereignties. But the citizen is not, therefore, to be twice punished for the same act. Nor can the state, by undertaking to punish the same offence by a lighter penalty, oust the United States of their jurisdiction. The state can no more betray by a kiss than prostrate by a direct blow. There is, then, such a repugnancy in the two acts as precludes the legitimate existence of both. The government of the United States is a government of the people. So is that of this state. Each is supreme within its sphere of jurisdiction, and its powers supreme.

He came to the conclusion, therefore, that the judgment ought to be arrested, for want of jurisdiction in this Court over the offence.

*Franklin,*
January,
1827.

State
*vs.*
Randall,

It may be contended, he said, that the act of congress not having made it an offence *to have in possession* a counterfeit bill of the U. S. Bank, with intent, &c. this state may legislate on that topick.

But this is fallacious. It would be to enable the states, substantially, to break in upon the jurisdiction of, and exercise the powers properly belonging to the United States——powers, too, which they have exercised to the exclusion of the states, by having legislated on the subject.

2. The statute on which this indictment is founded, is repugnant and inconsistent with itself. It declares, "that if any person shall counterfeit, or cause or procure to be counterfeited, or aid or assist in counterfeiting any bill or note issued, or to be issued by the president, directors and company of the Bank of the United States, &c. or shall alter any such bill or note issued or to be issued as aforesaid ; or shall utter, pass, or give in payment, or offer to pass or give in payment, or procure to be offered, passed or given in payment, or have in his possession with an intention to utter, pass or give in payment, any such *counterfeited* or altered, bill or note, knowing the same to be counterfeited or altered, &c. every person so offending, &c. shall be confined, &c."

The first clause of the section makes good sense ; and the bill to be counterfeited, therein spoken of, is unquestionably the *true* bill issued by the bank. But the second clause, on which the second and fourth counts of the indictment are founded, is void, because, "*such counterfeited* bill," therein spoken of, is the same bill *first* spoken of, which is the *true* bill. But suppose the words *counterfeit bill* had been used in the second clause ; then it would follow that such counterfeit bill must have been *issued* by the bank.

A decision has been had in the supreme court of the United States against the sufficiency of the act of congress, passed June 27, 1798, entitled "An act to punish frauds committed on the Bank of the United States," which was worded like the act now under consideration, and is conclusive upon this point. (*United States* vs. *Cantrill,* 4 *Cranch's Rep.* 167.) And congress found themselves under the necessity of amending the act, at their next session after the decision. Here, then, is a repugnancy which no time can obviate, and which no usage can cure.

3. The indictment is repugnant. The attorney for the state has displayed much ingenuity in drawing the indictment, in his endeavours to get round the repugnancy in the statute. But in avoiding one difficulty he has run into another. He charges the respondent with having in his possession, &c. "one certain false, forged and counterfeited bank note, which said note was made in imitation of, and did then and there purport to be, a bank note for the sum of ten dollars, *issued* by the president, directors and company of the Bank of the United States, &c. thereby charging the *false* note *to have been issued* by the bank.

*Franklin,*
*January,*
*1827.*

State
*vs.*
Randall.

*Smith,* State's attorney, contra, contended, that the offence charged in the second and fourth counts in the indictment (on which the respondent was convicted,) is punishable by the laws of this state, and that the courts of this state have the *exclusive* jurisdiction, in as much as the offence is not made punishable by any law of the United States.

The 18th section of the act of congress, incorporating the Bank of the United States, which provides for the punishment of forging, counterfeiting, &c. the bills of said bank, does not make it an offence, *to have in possession with an intention to utter, pass or give in payment,* counterfeit bills on said bank.----*See act* passed 1st session of 14th congress, p 40, sec. 18.

If the laws of the United States had constituted it an offence, still, it is contended, that would not have ousted the state courts of their jurisdiction.

But the proviso in the said 18th section, "that nothing in said act shall be construed to deprive the courts of the individual states of a jurisdiction under the laws of the several states, over any offence declared punishable by said act," puts at rest every question touching the jurisdiction of this Court.

Congress have not, by this proviso, given to the states jurisdiction of the offence, but have left to them the jurisdiction which they had before, thereby expressly excluding the implication of law which otherwise might have arisen, that the jurisdiction of the states was superseded by the law of congress.

The act of congress incorporating the Bank of the United States is a publick act, and the courts are bound to take notice of it.

The existence of said bank, and the fact that it has been in operation, are matters of general knowledge and notoriety, not requiring the formality of proof in this case.

If the section of the statute on which the indictment is predicated has an apparent repugnancy, on the face of it, the construction given by this Court for thirty years, aided by a legislative construction on the revision of the act in 1818, has obviated all the pretended difficulties.

The indictment, in this case, is drawn according to the established forms, sanctioned by this Court, upon a sound construction of the statute.

The opinion of the Court was pronounced by

HUTCHINSON, J.   The respondent has been heard upon a motion for a new trial, founded on the exceptions; and upon a motion in arrest, relying upon supposed defects in the indictment.

The motion for a new trial will first be considered.   The charge of the court excepted to, and which is contrary to what was requested by the respondent's counsel, is, that the existence of the Bank of the United States, and the fact, that the bank and the said branch thereof, have been in operation, are matters of general knowledge and notoriety, not requiring the formality of

*Franklin,*
January,
1827.

State
*vs.*
Randall.

proof in this trial. Another part of the charge presents one of the questions raised by the motion in arrest, to wit, the jurisdiction of the court.

If the existence of the Bank of the United States were to be proved at all, the legal proof would be a certified copy of the act of incorporation. In some of the early prosecutions, under our present statute, or a former similar statute, the charters were procured, and were present at the trial ; but there was no necessity of using them, that point not being litigated. Ever since that period the production of the charters has been dispensed with ; and the utmost proof required by the courts has been, the testimony of witnesses, who could testify, that the bank was in operation, issued such bills as were attempted to be imitated, and were in the regular habit of redeeming them. The long practice of our courts in this respect is conceded in argument; and no intimation was ever heard of, that a respondent was injured by this mode of proof. If there were no such bank ordinarily, such proof as this could not be furnished ; and if it were, it would only be *prima facie* evidence, and the respondent, knowing the origin of his own bills, could do this away by other proof.

In the present case, the respondent had the bills, purporting to be of the United States' Bank in his possession, with intent to pass them. So the jury have decided. What gave the bills of this bank and this branch of it, currency here, so that the respondent could pass them in the way of deal ; so that people would sell their goods, their cattle and their horses, and receive these in payment ? It was the knowledge generally possessed of the existence of such bank and branch thereof. When the subject of establishing the bank was before Congress, the debates upon it were published in the newspapers, and the re-result immediately known throughout the United States. The laws of the session were published in some newspaper in each state, and also in a book, and deposited in the town clerk's office in each town in this state, open to the inspection of all. Every person has seen the bills in circulation, and has thence, presumptive evidence of the existence of the Bank, and is satisfied to take them as current money on every payment he receives. The respondent knew there was such a bank, or he would not have expected to pass the bills. And in fact, the whole court and jurors knew of the existence of the bank, as well as those witnesses, whose testimony, according to the decisions for many years, would have been sufficient upon that point. The case might well be left, as it was, to rest upon that general knowledge which the jurors, in common with the other citizens of the United States, possessed with regard to the existence of the bank ; and that the same, and this branch thereof, were in operation. It is urged in argument, that there was no proof, that the bank ever issued bills of a size and description with those described in the indictment. This is not a point presented in the case, nor does it appear to have been urged at the trial ; but

*Franklin,*
January,
1827.

State
*vs.*
Randall.

the court consider it of no importance if it had been then urg-
ed. The statute is broad enough to comprehend all bills, that
are counterfeit, and which purport to be bills of the United
States' Bank. Suppose spurious bills, containing a promise on
the part of the bank to pay, were made and put into circulation,
of a size of which none had ever issued, say, bills of thirteen
dollars each; this would come within the statute; they would
be counterfeit bills of the bank, in a fair and legal sense of the
expression; and would have the same tendency to defraud all
persons who should receive them, as if bills of the same size had
been issued by the bank.

For these reasons, the motion for a new trial cannot prevail.

The motion in arrest is now to be considered; and the first
and second points urged will be disposed of together. The
first point is, that the courts of the United States have jurisdic-
tion of the offence charged. The second is, that the State Court
has no such jurisdiction; and the reason assigned in argu-
ment is, that the courts of the United States have a paramount
jurisdiction.

That the courts of the United States have this paramount ju-
risdiction, is inferred from the constitutional power of con-
gress to legislate upon this subject, and from their having in
fact so legislated. The power of congress upon this subject is
comprised in the 8th section, article 1st, of the constitution, on
the 27th page of our Statute Book, and is in these words;—
"The congress shall have power to provide for the punishment
of counterfeiting the securities and current coin of the United
States." Whatever power upon this subject is not given to
congress, by the above section, yet remains in the several states:
for this is all that gives any such power, and the 12th article
of the amendments, is as follows: "The powers not delegated
to the United States by the constitution, nor prohibited by it to
the states, are reserved to the states respectively, or to the
people.

Now, it is not, nor can it be, pretended, that bank notes are
a current coin, and within that expression of the constitution.
Nor is it easy to conceive how they can be termed the securi-
ties of the United States. The United States have not issued
them, nor are they holden to pay them. The United States
own some shares in the bank stock, and in this they are like
other stock-holders, but not the individual stockholders, but the
bank, or whole body of stock-holders, who act by their agents,
the President and Directors, issue the bills, and must pay them
when returned for payment. Those are the securities of the
United States, which are issued by their direction, and for
which they receive a consideration, and which they must pay
and redeem. Such are various certificates, indents and notes
issued by the officers of the UnitedStates, under some law of
congress, showing a debt due from the United States; such were
the treasury notes issued in the time of the late war .

*Franklin,*
*January,*
1827.

State
*vs.*
Randall.

If congress have any right to legislate upon that subject, they derive it by implication merely. It is inferred from their right to establish a bank; but it has been a subject of great doubt whether they have that right. And, if that right be doubtful, their right to give jurisdiction to the United States' courts of the offence of counterfeiting the bank bills, must be no lest doubtful.

But, if it were a conceded point, that congress have such a right to legislate upon this subject, we cannot admit, that by that merely, the state Legislatures are deprived of such right. The congress of the United States have never so understood the constitution, and great practical difficulty would result from such a construction.

The constitution, article 3d, section 2d, defines to what the judicial power of the United States shall extend; and among other things, says, it shall extend to controversies between a state and citizens of another state, between citizens of different states, between citizens of the same state, claiming lands under grants of different states, &c. Suppose congress had never passed any law giving the jurisdiction of these subjects to any particular court of the United States, or had never established any courts to whom such jurisdiction could be given, can it be pretended that these cases would be out of the pale of the law? That no action could be maintained in the courts of this state in favour of a citizen of Massachusetts, against a citizen of this state? No actions between our own citizens claiming lands under grants from different states? It is impossible that a court should so decide. In the provisions made by congress, adapted to these cases, they consider that the state courts hold jurisdiction, till some law of congress transfers the exclusive jurisdiction to the courts of the United States. Their provisions are contained in the 11th section of the judiciary act. That gives no jurisdiction whatever to the courts of the United States, in cases of common law and equity, unless the sum or value in controversy exceeds five hundred dollars, exclusive of costs: and the original jurisdiction is given in those cases only *in concurrence with the courts of the several states.* And a part of the same section gives to the circuit courts exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where said act otherwise provides, or the laws of the United States should otherwise direct, and concurrent jurisdiction with the district courts, of the crimes and offences cognizable therein. The expression, *offences cognizable under the authority of the United States,* implies, that congress must have power from the constitution to make, and in fact make, laws for the punishment of crimes, before the circuit courts can take cognizance of the same; and the exception which follows, takes out of this jurisdiction every case taken out and placed elsewhere by the same, or any other act of congress.

13

Franklin,
January,
1827.

State
vs.
Randall.

The foregoing views have been fully sanctioned by the su-preme court of the United States, in the case of *Houston* vs. *Moore*, 5 *Wheaton*, page 1. A statute of Pennsylvania, of March 1814, enacted, among other things, "that every non-commission-ed officer and private of the militia, who shall have neglected or refused to serve when called into actual service, in pursuance of any order or requisition of the President of the United States, shall be liable to the penalties defined in the act of the con-gress of the United States, passed on the 28th of February, 1795." *Houston* was called to go into actual service and refus-ed, and was fined by a court martial, ordered under the state authority, and the fine was levied of his property; and he brought his action of trespass for taking his property, which was decided against him in the highest court of the state; and the decisions comprised in a bill of exceptions were revised upon a writ of error, brought to the supreme court of the United States, and the question to be decided was, whether the state statute was constitutional? It was decided so to be, and the judgment was affirmed. This is a long report, and the ques-tion of concurrent jurisdiction of the United States' courts and state courts fully examined; and the result drawn, is, that where congress may give jurisdiction to the courts of the Unit-ed States, yet have not done it, the state courts retain jurisdic-tion; or, if exclusive jurisdiction is not given to the United States' courts, the state courts retain concurrent jurisdiction.

The cases alluded to, of state bankrupt laws and steam boat grants, rest upon other parts of the constitution, and have little or no analogy to the present question. The state bankrupt laws fall within a section of the constitution which negatives the power of a state to pass laws of the nature therein named; one of which is a law impairing the obligation of contracts. And the steam boat grants import an exclusive privilege, which interferes with the powers of congress to regulate commerce with foreign nations, and among the several states, and with the powers actually exercised by congress in regulating the coasting trade.

Hence we have arrived at the conclusion, that even if con-gress have the power and right to give exclusive jurisdiction over this offence to the courts of the United States, until they shall have done so, the jurisdiction remains in the state courts, by force of the laws of the several states, as fully as if congress had no power to legislate upon the subject.

But it is said, that congress have legislated upon the subject, and made provision for the punishment of the same offence; and the act of congress is produced. See the statute of 1816, *Ingersol's Digest*, page 93. The terms of the body of this stat-ute are sufficiently extensive to confer entire jurisdiction over this offence to the courts of the United States; but the whole statute must be construed together, or the correct inference will not be drawn. And the statute contains the following proviso: "Provided that nothing herein contained, shall be construed to

Franklin,
January
1827.

State
vs.
Randall.

deprive the courts of the individual states of a jurisdiction, under the laws of the individual states, over any offence declared punishable by this act." The necessary construction of this statute is, that congress admit, or concede the previous power of the states to enact laws, and their courts to execute them, over this offence, and give jurisdiction to the courts of the United States, *sub modo*, and so as not to interfere with that previous jurisdiction of the state courts. The 17th of *John. Rep.* pages 4th and 261st, is cited to show, that congress cannot give jurisdiction to the state courts. Probably they cannot give such jurisdiction, but it is unnecessary now to decide that question. It is sufficient for the present case, if the courts of this state would have had jurisdiction, had not congress interfered at all, and that the interference of congress expressly leaves the state courts enjoying all the rights of jurisdiction they had before the act of congress passed. The distinction between the conferring a jurisdiction by congress, and the refusal to take away a jurisdiction already enjoyed, is too obvious to require elucidation.

Other acts of congress, of an earlier date, punishing the counterfeiting of United States' bank bills contain each the same proviso. In fact, that subject has never by congress been taken from the jurisdiction of the state courts, where they held the same by their own laws.

Furthermore, congress have the most conclusive right to legislate upon the subject of counterfeiting the coins, and may give exclusive jurisdiction for the punishment thereof to the courts of the United States. Upon this they have legislated, and have given jurisdiction to the courts of the United States, but not exclusive; for they have added a proviso similar to the other, expressly leaving a concurrent jurisdiction in the state courts, under the state laws. See said *Ingersol's Digest*, page 163.

This concurrent jurisdiction has always been exercised by the state courts ever since the organization of the federal government, both over the subject of counterfeiting the coins and the bills of the United States' Bank. Many convictions have been had, and prisoners punished corporeally, and by confinement to hard labour, and otherwise, according to the laws of the several states. We should be afraid, at this late period, to decide that all these convictions have been *coram non judice*, and prepare the way for all the prisoners to bring their actions of trespass against those who inflicted the punishments, and even against the judges themselves.

Besides, during all this time, no person has ever appealed to the paramount jurisdiction of the United States' courts for redress, nor has any branch of the United States' government furnished an intimation, that these proceedings were wrong. The practice, therefore, universal in itself, is supported by general approbation; and a contrary practice would be attended with such incalculable inconvenience, that no state tribunal

*Franklin,*
January,
1827.

State
*vs.*
Randall.

ought ever to take the lead in attempting a change. What could be done in case of a change? Congress have made no provision for such an event. Their laws punish by confinement to hard labour; but they have made no provision for any place for such confinement. The marshal may hire, if he can; othwise there is no place within his control. It would require an entirely new regulation of United States' prisons, if the jurisdiction of the courts of the United States were to become and be considered as exclusive over all the crimes of which they may take jurisdiction.

The object of the Federal Compact does not require such a course. That object is to unite the strength of all the states for the common support and defence of their national rights. To effect this, the judicial power of the courts of the United States should extend to all those matters that may affect the general union, and tend to support its integrity and harmony. Their jurisdiction should extend over such crimes as necessarily affect the Union, or the Federal Government as such. Hence their criminal code is almost exclusively of this description. The statutes of the United States provide for the punishment of treason against the United States; piracy, murder or robbery upon the high seas, or a territory under the sole jurisdiction of the United States, forgery of the publick securities of the United States, stealing, altering, &c. the records of the United States' courts, perjury committed in the courts of the United States; resisting the officers of the United States in their official duties; the counterfeiting the coins of the United States, &c. &c. So far as this last offence is an attack upon the Mint of the United States, or upon the Treasury, by creating a liability that counterfeit coins make a part of the national funds, it is not only proper, but necessary that there should be a tribunal for their punishment, without depending upon the state courts. But, so far as the crime bears principally upon the rights of the citizens of the individual states, it is at least, safe and proper to permit the state courts, under the state laws, to punish such offence. The cases might be too numerous to receive a proper attention from the high tribunals of the United States, so few in number as are provided, and so remote may be the officers whose duty it might be to prosecute. But, be this as it may, congress, while they give a jurisdiction to the courts of the United States over the counterfeiting the coins and the bills of the United States' bank, say expressly, that they will not take from the state courts any jurisdiction they may have, by the laws of the individual states, over the same offences.

But there is urged upon the Court the hardship, and even absurdity, that a man should be liable to be arraigned before two distinct tribunals, for the same offence. The difficulty in this, like other concurrent jurisdictions, is rather imaginary than real. The court that first has jurisdiction, by commencement of the prosecution, will retain the same till a decision is made; and a

*Franklin,*
January,
1827.

State
*vs.*
Randall.

decision in one court will bar any farther prosecution for the same offence, in that or any other court. It is like the case of civil suits for matters over five hundred dollars, between citizens of different states. The creditor may sue, at his election, either before the court of the state, or of the United States; but, when he has made such election, the debtor is safe from any liability to be called before the other court. So, if goods are stolen in one county, and carried by the thief through several counties, he is liable to be prosecuted in either of those counties; but, when prosecuted in one, that puts an end to his liability for that offence.

Sufficient, perhaps, is said, even if the crime charged were clearly comprised in the United States' statute, for then the jurisdictions would be concurrent; but the crime of which the respondent stands convicted by the jury is clearly not contained in said statute. It is contended, however, that, although the same act is not punished by the United States' law, yet congress having legislated upon the subject, all is to be considered as included; what is not expressed is to be considered as merged in what is expressed: or, in other words, congress having affixed a punishment to the forging and passing these counterfeit bills, it is a virtual enactment, that no other transaction concerning them shall be made penal. This argument is plausible, and may be applied with correctness and force to certain cases where the very enactment implies a negative of all other provisions. For instance, the laws of congress, regulating the coasting trade and prescribing requisites that must be complied with by all who embark in that trade, necessarily imply that the trade may be pursued with no other restraints from government than those prescribed. So of the laws regulating foreign commerce, so far as relates to the requisitions of our own government. But those who sail within the jurisdiction of any foreign government, must not consider our government as warranting that there shall be no new requisitions there. The same may be said of statutes in general, that confer rights unconditionally. No condition can be lawfully added afterwards. But, should courts decide that a statute of the United States' congress, providing for the punishment merely of the original counterfeiting of coins or bank bills, divests each state of the power to pass a law, to punish the passing, to her own citizens, such counterfeit coins or bills, this would be narrowing down the sovereignty of the individual states to a small compass. Just so, should congress, as in the present case, provide a punishment for making and passing, but none for the having in possession, with intent to pass. The powers of a state, necessary to prevent a continual depredation upon her citizens, by fraud and deception, should never be thus narrowed down by implication merely. It is soon enough for the state courts to relinquish their jurisdiction over such offences, where it is expressly conferred by the statute of the state, when some act of congress transfers the exclusive jurisdiction to the courts of the United States.

Franklin,
January,
1827.

State
vs.
Randall.

The decision of the Court is, that the state court has jurisdiction of the offence charged, and of which the respondent has been found guilty.*

Another objection urged in arrest, is, that the statute, upon which the indictment is founded, is so repugnant to itself as to be wholly void. (*See the statute, p.* 261.) So far as need be recited, it is as follows: "That if any person shall counterfeit, or cause or procure to be counterfeited, or aid or assist in counterfeiting, any bill or note issued, or to be issued, by the president, directors and company of the bank of the United States, or shall alter any such bill or note, issued or to be issued, as aforesaid, or shall utter, pass, or give in payment, or offer to pass or give in payment, or procure to be offered, passed, or given in payment, or have in his possession, with an intention to utter, pass or give in payment, any such *counterfeited*, or altered bill or note, knowing the same to be *counterfeited* or altered," &c. The repugnancy objected to, is created by the use of the word *counterfeited*. It is said, that the expression, a counterfeited bill, imports the true bill, in imitation of which some spurious bill is made; and that the expression in the indictment, "had in his possession a certain false, forged and *counterfeited* bank note, with an intention to utter, pass and give in payment the same, which was made in imitation of, and did purport to be a bank note, issued, &c." imports the charge of having in his possession the true bill, not the spurious one; and that the alleging it to be false and forged, (words not in the statute) does not help the case, but adds to the repugnancy. The respondent's counsel, in support of this objection, have cited the *4th of Cranch R.* 167, *United States vs. Cantrill.* That was a motion in arrest, for two reasons assigned, one to the indictment itself, and one to the statute on which it was predicated. It was submitted without argument, and the court decided, that the judgment ought to be arrested for reasons assigned in the record. In adverting to the reasons, the statute is recited as follows. "If any person shall utter or publish, as true, any false, forged or counterfeited bill or note, issued by order of the president, directors and company of the bank of the United States, and signed by the president, and countersigned by the cashier," &c. This recital furnishes reason enough for the arrest, for such a statute punishes the publishing as true, bills actually issued by order of the president, &c. and actually signed by the President, &c. Such bills may be said to be counterfeited, according to the strict interpretation of that word, but they cannot be called false and forged; nor ought people to be punished for passing them. It is not so easy to see the force of the other objection, nor is it certain that the court intended to sanction it.

---

*The case above cited from the 5th of Wheaton, 1st page, was not read at the hearing, the book not being in town, as was understood. But the 25th,—6th and 7th pages are very full in point, upon the subject of concurrent jurisdiction as decided in the text. The judge even states the very statutes about counterfeiting the coins and bank bills, as instances of clear concurrent jurisdiction, to support the opinion of the Court, in the militia case before them.

The charge is, that the defendant "a certain false, forged and counterfeit paper, purporting to be a bank bill of the United States, for ten dollars, signed by *Thomas Willing*, president, and *G. Simpson*, cashier, &c." It is said, that this means and imports, that the false and counterfeit bill was in fact signed by *Thomas Willing*, and so of the cashier. This is not the necessary construction, and it is obvious · the person who drafted the indictment, intended the word *signed* should refer to the true bill, which the counterfeit purported to be. Remove the comma that precedes the word *signed*, and such would be the necessary construction, and the objection would vanish. And it would seem hardly proper to quash an indictment upon so nice a point as would depend upon the punctuation, which is always in some degree arbitrary.

*Franklin,*
*January,*
*1827.*

State
*vs.*
Randall.

Possibly another objection might have had weight, though it does not appear to be noticed. The expression is, a bill of the United States, not of the bank of the United States. This was a failure to declare within the statute. At any rate, the United States' statute was considered to be a nullity, and congress passed another upon the same subject.

It is suggested, that the same repugnancy exists in the statute of this state, above recited, as in that of the United States. If the word *counterfeit* had been used instead of the word *counterfeited*, in the two last places where it occurs, in what is herein before recited, the difficulty would all be removed, with regard to that part of the statute. The word is used in its proper sense where it first occurs in the section. The expressions, "shall counterfeit, or procure to be counterfeited, or assist in counterfeiting," mean the making or procuring to be made, or assisting to make a false and counterfeit bill, in imitation of a true bill, issued, &c. and the expression, "had in his possession a counterfeit bill, knowing the same to be counterfeit, and with intention of uttering, &c." would be a consistent and proper description of the crime intended to be punished. And wherever the word *altered* is used in the section, it is used in a consistent and proper sense. It is obvious, that the legislature, in this statute, used the word *counterfeited* in the sense of *counterfeit*, in the part applicable to this indictment. Now the question is, shall the Court sanction this use of the word, or decide the statute void, for its repugnant use of the word? In *Swift's Dig. 1st vol. p.* 12, several rules of construing statutes are collected, which may be of use upon this question.

1st. We must consider the subject matter, and affix to the words used, a meaning correspondent to the subject to which they are applied. In applying this rule, it is plain the object of the legislature was, to provide for the punishment of every kind of traffick in spurious bank bills. They begin by describing, in proper language, the making of them, and then proceed, in as proper language, to describe the passing them and having them in possession, with intent to pass, till they come to the word which should characterize the spurious bill, and there use the

Franklin,
January,
1827.

State
vs.
Randall.

word *counterfeited*. To construe this as meaning a true bill, or the one of which a counterfeit was passed, or intended to be passed, would be changing the subject matter entirely. If there can be no mistake, either by the Court, or those who read the statute to learn what conduct is prohibited, as to what the legislature intended by the word *counterfeited*, we ought to construe it as they intended it. Words are but signs of ideas, and the same words are frequently used, in some degree, in different senses. The ancient forms of declarations for assault and battery, show that the word *entreat* was then used in the same sense as we now use the word *treat*.

A second rule from the same author is, "The cotemporaneous exposition of a statute is to be regarded; such as the opinion of the sages of the law who lived at the time it was made." In applying this rule, we observe, that the statute of 1797, made upon this subject, and which was in operation twenty years, used the word *counterfeited* in the same place and sense as this statute. Very many indictments were framed, and convictions had upon that statute. Some were met with demurrers, others with motions in arrest. The ablest counsel in the several counties were employed to defend, and it is not known that any indictment failed, through the insufficiency of that statute. Either the counsel thought it no objection, and did not move it, or it was overruled. Every State's Attorney found difficulty upon the subject. But the indictments were drawn much upon the plan of these 2d and 4th counts, describing the spurious bill, and then saying, that it was made in imitation of, and did then and there purport to be, a bank note of, &c. issued, &c. describing the true bill, imitated by the spurious one. But in a count for uttering, &c. the expression, *knowing the same to be counterfeited*, was necessarily used, for such was the statute.

A third rule from the same author is, that "Words and phrases, the meaning of which has been ascertained in a statute, are, when used in a subsequent statute, to be understood in the same sense."

After the statute of 1797 had been in operation twenty years, and the word *countefeited* had been considered as meaning the same as the word *counterfeit*, not only in the statute, but in indictments founded upon it, in all, or nearly all the counties of the state, the revision of the criminal code was submitted to a respectable judiciary committee, who reported, and the legislature enacted, the law now in question, placing the word *counterfeited* where it must be understood in the same sense as in said former statute, from which this was nearly copied. Here then, is virtually an enactment of the legislature, that the word *counterfeited* in that statute shall mean the same as *counterfeit*.

It is worthy of observation, that though congress passed a new law to remedy the evils in the old one, as before mentioned, yet the word *counterfeited* is used in the same sense as in our statute, three times in the statute of the United States, now in force, to punish the counterfeiting the publick securi-

Franklin,
January,
1827.

State
vs.
Randall.

ties; and once in the act to punish the *counterfeiting* of bank bills.

In the *Supreme Court* in Windsor county, August term, 1822, *Joab Young* was convicted on an indictment consisting of two courts, one charging him with passing, and the other with having in possession, with intent to pass, a spurious bank note. There was a motion in arrest, and the same objections of repugnancy of the indictment, and want of conformity to the statute urged, as here. The indictment was very similar to this, except in one place it contained the word *counterfeited*, and the other *counterfeit*; which itself afforded an argument of inconsistency and want of conformity to the statute. The motion was overruled, and the respondent received sentence.

Another objection urged in arrest, is, that the indictment is not correctly drawn upon the statute. These 2d and 4th counts, as before observed, are drawn upon the same plan above alluded to, as having been long in use upon this and the former statute; and it is not easy to draw one more conformably to the statute, unless it be to avoid the difficulties to be considered in the last objection, urged in arrest; which is, "That the indictment is repugnant to itself." The indictment is, "felloniously, and with force and arms, did have in his possession, with an *intention* to utter, pass and give in payment, a certain false, forged and counterfeited bank note; which said note was made in imitation of, and did then and there purport to be, a bank note for the sum of ten dollars, issued by the President, Directors, and Company of the Bank of the United States, made payable at, &c. to, &c. numbered, &c." So far as this last objection rests upon the use of the word *counterfeited*, it is already answered. What further is urged, is understood to be, that the expressions, *issued by, made payable to, made payable at, numbered, &c.* by necessary grammatical construction, refer, not to the bill, of which the counterfeit was made in imitation, and which it purported to be, but to the counterfeit bill itself. And the case cited from the *4th of Cranch* is considered in point to this objection, and as such it is before observed upon.

The Court realize no difficulty upon this subject. The most direct and plain construction refers those expressions to the *true* bill of ten dollars in the sense of the indictment; or, in other words, makes them follow the expression, *purport to be.* And the sense is the same as if the sign of the infinitive mood were repeated as we come to each of those expressions. To carry back those expressions, not only beyond the first antecedent, the ten dollars, but beyond the verb and infinitive mood, and make them refer to the false, forged and counterfeited bill, would be a very forced construction. The sense is evidently the same as if it were alleged, *which note was made in imitation of, and did purport to be a bank note of ten dollars, and to be issued by the President, &c. and to be made payable at, &c. and to be numbered, &c.* While the sense is the same, the language is much more

14

suitable, and less grating to the ear, as the indictment is drawn, than this would be.

State
*vs.*
Randall.

All the objections being disposed of, the motion in arrest is overruled.

PRENTISS, J. absent by reason of indisposition.

*John Smith,* attorney for the state.

*C. P. Van Ness,* and *Bates Turner,* for the respondent.